UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN RAMSEY,<br><br>                    Plaintiff,<br><br>     v.<br><br>HARTFORD LIFE INSURANCE COMPANY,<br><br>                    Defendant. | Case No. 4:12-cv-00527-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment on Plaintiff John Ramsey's breach of an insurance contract claim against Defendant Hartford Life Insurance Company. Ramsey claims that he is entitled to recover death benefits arising from the accidental death of his ex-wife, Margie Ramsey. Hartford responds that Margie Ramsey's death was not covered under the policy. On April 1, 2013, the Court heard oral argument and took the matter under advisement.

Having considered oral argument and the record, the Court concludes that the policy covers Ms. Ramsey's accidental death, but finds no evidence that Hartford denied coverage in bad faith. In addition, the Court finds that Ms. Ramsey purchased a

voluntary plan benefit of $100,000 and not $150,000.  Hartford, however, shall refund the excess premiums Ms. Ramsey paid for the family benefit.

## BACKGROUND

Plaintiff John Ramsey's ex-wife, Margie Ramsey, died on July 19, 2011.  At the time of her death, Ms. Ramsey was insured under an accidental death and dismemberment policy issued by Hartford.  Ms. Ramsey obtained the policy through her credit union, Advantage Plus Federal Credit Union. The policy provided for a Basic Plan benefit for Ms. Ramsey in the amount of $1,000.00 and a Voluntary Plan benefit in the amount of either $100,000.00 or $150,000.00. *Id.*  Ms. Ramsey named Ramsey as the sole beneficiary under the policy.

Prior to her death, Ms. Ramsey was taking several different kinds of medications prescribed by her physician. Those medications included Amitriptyline for bipolar affective disorder, Propranolol and Maxalt for headaches, and cyclobenzaprine (brand name Flexeril) for flank plain and headaches. Ms. Ramsey also was legally blind and used a service dog.

Between May 13 and June 16, 2011, Ms. Ramsey visited her physician on various occasions to obtain counseling regarding her medications. That counseling included arranging pharmacotherapy treatment, eliminating duplicate medications, limiting "as needed" medications, addressing issues she had related to taking medications while blind, suggesting that she discuss those issues with her pharmacist, changing the delivery system of her Flexeril (cyclobenzaprine) to a blister pack because she was blind,

discussing side effects and indications of her medications, and arranging for a nurse to conduct an in-home medication reconciliation.

Despite taking these precautions, Ms. Ramsey stopped breathing on the night of July 16, 2011. She was transported by ambulance to Portneuf Medical Center's Emergency Room. There it was reported that she had not been feeling well the day before she was transported to the ER, and shortly before she was transported, she had been snoring in an unusual way during her sleep and began breathing abnormally before her breathing stopped altogether. The ER staff placed her on a ventilation system. Lab results showed a critically high tricyclic level of 963. On July 19, 2011, Ms. Ramsey showed no evidence of responsiveness, which established a diagnosis of brain death. She died that same day.

For purposes of summary judgment, the parties have stipulated that Ms. Ramsey "died as a result of poisoning through the prescription use of cyclobenzaprine and tricyclic antidepressant; or a toxic cross-reaction between those two prescription medications; or poisoning from those two prescription medications due to the alteration of the manner in which the delivery of her medication was facilitated and the fact that she received an overdose of those medications."

No one contends that Ms. Ramsey was suicidal. Her death certificate identified the cause of death as "an accidental overdose of a tricyclic medication." Ms. Ramsey took her medications as prescribed. And there is no evidence that she had ingested any non-prescribed medications or illegal drugs.

After Ms. Ramsey's death, Ramsey applied for death benefits under the life insurance policy. Hartford denied Ramsey's claim on the grounds that Ms. Ramsey's death was not the result of an "Injury" as defined in the policy. Specifically, in the "Definitions" section of the Certificate of Insurance, the policy defines "Injury" as

> ... bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is covered under the policy. Loss resulting from: a) a sickness of disease, except a pus-forming infection which occurs through an accidental wound; or b) medical or surgical treatment of a sickness or disease; is not considered as resulting from injury.

*Policy* at 5, Dkt. 11-3.  ." *Id.*

Hartford concluded that, to the extent Ms. Ramsey's fatal overdose resulted from taking cyclobenzaprine and tricyclic antidepressant, the medicines prescribed to treat her chronic headaches and bipolar affective disorder, such loss was a result of "medical or surgical treatment of a sickness or disease," and thus did not meet the definition of Injury required for covered losses under the Policy.

Because Hartford concluded that Ms. Ramsey's fatal overdose did not qualify as an "Injury," Hartford never addressed the separate "Exclusions" section. This section expressly excludes from coverage losses resulting from (1) intentionally self-inflicted injury or suicide, (2) war, (3) Injury sustained while in the full-time armed forces of any country or international authority, (4) Injury sustained while riding an aircraft, except a Civil or Public Aircraft or a Military Transport Aircraft, (5) Injury sustained while riding on any aircraft as a pilot, crewmember, flight instructor or examiner, (6) Injury sustained while voluntarily taking illegal or non-prescribed drugs, unless the drug is taken as

prescribed or administered by a licensed physician, (7) Injury sustained in the course of a felony, (8) Injury sustained while legally intoxicated from alcohol. *Policy*, "Exclusions" at 5. Most important to this case is the sixth exclusion, or the drug exclusion, which excludes from coverage any "Injury sustained while voluntarily taking drugs which federal law prohibits dispensing without a prescription, **unless the drug is taken as prescribed or administered by a licensed physician**." *Id.* (Emphasis added).

After Hartford denied Ramsey's written requests to pay him the policy's benefits, he filed this action for breach of contract and bad faith.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact-a fact "that may affect the outcome of the case." *Id.* at 248.

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties argue there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

## ANALYSIS

**1. Insurance Contracts Must be Construed in Favor of the Insured.**

Generally, Idaho courts construe insurance contracts in accordance with their plain, unambiguous language. *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 115 P.3d 751, 754 (Idaho 2005). "In construing an insurance policy, the Court must look to the plain meaning of the words to determine if there are any ambiguities." *Id.* Whether ambiguities exist is a question of law for the court to determine. *Farm Bureau Mutual Insurance Co. Of Idaho v. Schrock*, 252 P.3d 98, 102 (Idaho 2011). Like other contracts, insurance policies are ambiguous if they are reasonably subject to conflicting interpretations. *Id.*

Insurance contracts, however, are "subject to certain special canons of construction." *Clark v. Prudential Property And Casualty Ins. Co.*, 66 P.3d 242, 244 (Idaho 2003). First, Idaho law demands that insurance contracts be construed in favor of their general objectives rather than based on a "strict technical interpretation" of the policy language. *Erikson v. Nationwide Mut. Ins. Co.*, 543 P.2d 841, 845 (Idaho 1975). Second, "ambiguities must be construed most strongly against the insurer." *Clark*, 66

P.3d at 245. This means that if an insurance contract is ambiguous, it must be construed in a light most favorable to the insured **and** in a manner which provides full coverage for the indicated risks rather than narrowing its protection. *Cascade Auto Glass*, 115 P.3d at 754.  Finally, the burden is on the insurer to use clear and precise language if it wishes to restrict the scope of coverage." *Id.*  "Exclusions not stated with specificity will not be presumed or inferred." *Id.*

## 2. The "Medical Treatment" Exclusion Does Not Exclude Coverage For Ms. Ramsey's Death.

Ms. Ramsey's policy provides for coverage and payment of benefits if the insured person's death results from an "Injury."  The policy defines "Injury" as "bodily injury resulting directly from accident and independently of all other causes, which occurs while the Covered Person is covered under the Policy. "  The policy does not define the terms "accident" or "accidental death," but the Idaho Supreme Court has held that the term accident "has a settled legal meaning or interpretation."  The Court reached this conclusion based upon the definitions contained in two dictionaries:

> *Insurance contract.* An accident within accident insurance policies is an event happening without any human agency, or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens. A more comprehensive term than "negligence," and in its common signification the word means an unexpected happening without intention or design.
>
> Black's Law Dictionary 14 (5th ed. 1979).
>
> ac • ci • dent (ak #si dent), n. 1. an undesirable or unfortunate happening, unintentionally caused and usually resulting in harm, injury, damage, or loss; casualty; mishap: automobile accidents. 2.

>an event that happens unexpectedly, without a deliberate plan or cause....
>
>Webster's Encyclopedic Unabridged Dictionary 9 (1989).

*Mutual of Enumclaw v. Wilcox*, 843 P.2d 154, 159 (Idaho 1992).

There is no dispute that Margie Ramsey was a "Covered Person" under the policy since her death was the result of an accidental overdose of a physician-prescribed medication. The evidence also indicates that Ms. Ramsey died an accidental death. First and foremost, her death certificate supports this conclusion. It identifies the cause of death as an "accidental" overdose. Statements found in her medical records, as well as from her friends and family members, suggest that Ms. Ramsey did not expect to die, and they do not indicate she deliberately planned to die. Thus, it would appear that Ms. Ramsey's death was unintentionally caused and happened unexpectedly. *See,.e.g, Santaella v. Metropolitan Life Ins. Co.,* 123 F.3d 456, 465 (7th Cir. 1997) (finding death of prescription drug abuser to be an "accident")

Idaho law also supports the conclusion that Ms. Ramsey's death resulted "independently of all other cause." In *Erikson*, the Idaho Supreme Court discussed this phrase. 543 P.2d at 846-48. Mr. Erikson sought insurance benefits for loss of sight under his accident policy through Nationwide Mutual Insurance. Mr. Erikson gradually lost his sight after he was struck in the eye by a pine bough while snowmobiling. Experts disputed whether Mr. Erikson's pre-existing condition called sclerosis or the snowmobiling accident caused his loss of sight. In affirming the jury verdict awarding Mr. Erikson insurance benefits, the Idaho Supreme Court held "the mere fact that a latent

disease or bodily infirmity exists prior to accident, upon which the accident acts to precipitate the loss, will not defeat coverage so long as the disease or infirmity appears as a passive ally and the accidental cause predominates." *Id.*, *Erikson* teaches that an accidental injury does not have to occur in a vacuum to have resulted "independent of all other causes."

Like Mr. Erikson, Ms. Ramsey had pre-existing medical conditions that placed her in a position where an accident could occur, but there is no evidence that these pre-existing medical conditions caused her death. Rather, they only exposed her to the risk that an unexpected injury, like an accidental overdose could occur. The accidental overdose was the sole cause of Ms. Ramsey's death and therefore it was an injury independent of all other causes. *Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1253 (10th Cir. 2010) ("We therefore conclude that, under Oklahoma law, an accidental prescription drug overdose that is the sole proximate cause of a insured's death is an injury independent of all other causes.").

Hartford counters that Ms. Ramsey's death – who died of an overdose of two medications prescribed to treat her chronic headaches and bipolar affective disorder – did not meet the definition of "Injury" because her death resulted from the medical treatment of a sickness or disease.

The definition of "Injury" includes an exclusion for any loss resulting from medical treatment of a sickness or disease. This medical treatment exclusion, if read in isolation, could be read to exclude Ms. Ramsey's death – caused, as it was, by her taking drugs prescribed to treat her chronic headaches and bipolar affective disorder. Indeed, at

least one court, confronting similar policy language and similar facts, ended its inquiry at the definition of injury. *Grobe v. Vantage Credit Union*, 679 F.Supp.2d 1020 (E.D.Mo. January 20, 2010).

In *Grobe*, the court reviewed a policy with provisions essentially identical to Ms. Ramsey's policy: the same definition of "Injury," the same medical treatment exclusion included in the definition of "Injury," and the same drug exclusion excepting losses caused by prescribed drugs. The court found the medical treatment exclusion "unambiguously include[d] death caused by accidentally overdosing on a drug prescribed by a doctor for a medical condition." *Id.* at 1031. Because the court found this provision unambiguous, the court refused to consider the interplay between the medical treatment exclusion and the drug exclusion: "If a drug is taken by an individual in the course of medical treatment of a sickness or disease, and a loss results from (in other words, is caused by) that drug use, there is no injury and the inquiry ends." *Id.* at 1032-33. The drug exclusion, according to the *Grobe* court, is only triggered "[i]f a drug is taken for a reason unrelated to sickness or disease." *Id.* at 1033.

Not all courts agree, however. In *Clark v. Metropolitan Life Insurance Company*, 369 F.Supp.2d 770 (E.D.Va.2005) – which the *Grobe* court declined to follow – the court also considered the relationship between a medical treatment exclusion and a drug exclusion. The policy excluded losses caused by "physical or mental illness or diagnosis or treatment for the illness" and losses caused by "the use of any drug or medicine, unless used on the advice of a licensed medical practitioner ...." *Id.* at 772.

Contrary to the *Grobe* court, the *Clark* court found it must consider the two exclusions "in conjunction." *Id.* at 778. Reading the contract as a whole, the *Clark* court found that the policy interpretation the insurance company proffered, which would exclude deaths caused by the use of medicine on the advice of a physician to treat an illness, would render the exception to the drug exclusion for the use of drugs on the advice of a physician "a nullity." *Id.* at 778. *Id.* The court refused to read the medical treatment exclusion in this way, which "clearly" conflicted with the exception to the drug exclusion.

The Court agrees with *Clark* and declines to follow *Grobe*. The Court is mindful that the Ramsey's policy is identical to the policy at issue in *Grobe*, in labeling the medical treatment exclusion a "Definition" rather than an "Exclusion." However, regardless of how the medical treatment language is labeled, it was clearly an exclusion from coverage. In short, it eliminated coverage for certain injuries that would otherwise be covered, i.e., losses or injuries resulting from sickness or disease or treatment of a sickness or disease. So no matter how Hartford labels the medical treatment provision, it is an exclusion – a provision that "eliminates coverage where were it not for exclusion, coverage would have existed." Black's Law Dictionary 563 (6th ed. 1990). It therefore must be treated as an exclusion, and not a clarifying definition.

This distinction is important for two reasons. First, Idaho law places the burden of proving coverage on the insured, but places the burden of proving an exclusion on the insurer. *Harman v. Northwestern Mutual Life Ins. Co.*, 429 P.2d 849, 850-51 (1967). Thus, to read the medical treatment language as defining coverage, rather than creating –

as it does – an exclusion from coverage, would permit the insurer to impermissibly shift the burden of proof to the insured. Second, properly characterizing the medical treatment language as exclusionary places it on a par with the other eight exclusions. The Court must therefore read the medical treatment exclusion and the drug exclusion "in conjunction" as the *Clark* court did. *Barr Development, Inc. v. Utah Mortg. Loan Corp.*, 675 P.2d 25, 27 (Idaho 1983).

Reading the two exclusions together, the Court agrees that medical treatment exclusion renders the prescription drug exception to the drug exclusion "a nullity." The definition of "unless" is "except on the condition that; under any other circumstances than." Merriam–Webster Dictionary, available at www. merriam- webster. com. Thus, a reasonable person would read this provision as excluding injuries resulting from taking illegal drugs or drugs but excepting injuries resulting from taking drugs *as prescribed or administered by a licensed physician*. A reading of the medical treatment exclusion as excluding coverage for deaths caused by prescription drugs would place it in direct conflict with the drug exclusion, which appears to provide coverage for deaths caused by prescription drugs. The Court cannot adopt such a reading of the policy, since it renders one provision of the policy meaningless, or creates an irreconcilable conflict. *Idaho Power Co. v. Cogeneration, Inc.*, 9 P.3d 1204, 1214 (Idaho 2000).

In addition, the Idaho Supreme Court has stated that special provisions in a contract will control over general provisions where both of the provisions relate to the same thing. *Barr*, 675 P.2d at 27. The medical treatment exclusion is a general exclusion that pertains to all types medical and surgical treatment. The exception to the drug

exclusion, however, is more specific in that relates only to the prescription of drugs. Because the exception to the drug exclusion is more specific, it controls. *Id.*

Thus, the exception to the drug exclusion for losses caused by taking drugs as prescribed by a physician creates an ambiguity in the contract. Ambiguities must be construed in a light most favorable to the insured and in a manner which provides full coverage for the indicated risks rather than narrowing its protection. *Cascade Auto Glass*, 115 P.3d at 754. For all these reasons, the Court finds that the medical treatment language does not exclude accidental deaths caused by taking prescription drugs.

Applying this interpretation to this case, Ms. Ramsey's death is covered under the policy. Ms. Ramsey died because of an accidental overdose of a tricyclic medication. Ms. Ramsey took the medications as prescribed by her physician, but an unforeseen or unexpected reaction to the medications or how they were administered caused Ms. Ramsey to overdose. Her death was therefore a covered loss under the policy. *Cf. Smith v. Stonebridge Life Ins. Co.*, 582 F.Supp.2d 1209, 1224 (N.D.Cal. 2008).

### 3. *Cady v. Hartford Life & Accidental Insurance Co.* Does Not Control.

After the parties submitted their briefing, this Court issued a decision in *Cady v. Hartford Life & Accidental Insurance Co.*, No. 3:10–CV–00276–EJL, --- F.Supp.2d ----, 2013 WL 1001073 (D.Idaho March 13, 2013), which interpreted an essentially identical policy and found in favor of Hartford. Hartford argues that *Cady* supports its interpretation of the policy. In *Cady*, Matthew Marsh died from an "overdose of prescription and non-prescription drugs." *Id.* at *1. As the named beneficiary under a Hartford accidental death and dismemberment insurance policy, Nicole Cady sued

Hartford under the Employment Retirement Income Security Act ("ERISA") to recover death benefits. The Court rejected Cady's claim, and as part of its analysis, found "Hartford's interpretation of 'Injury' in conjunction with the prescription drug exclusion [was] neither ambiguous nor absurd." *Id.*

While this Court sided with Hartford in *Cady*, it viewed the policy language through the ERISA prism, which casts a much different light on the issue. *Cady* involved the question of whether Hartford's interpretation of the policy was so absurd that it established that Hartford's structural conflict of interest improperly affected its denial of benefits. *Id.* at *8-11. Applying federal common law and relying extensively on *Grobe*,[1] the *Cady* court concluded that Hartford's interpretation was not absurd or ambiguous. *Id.* at *10.

Looking at the issue in the context of ERISA, this Court agrees that Hartford's interpretation of the policy is not unreasonable. But neither is Ramsey's. And Idaho law mandates, when policy language may be given two meanings, "one of which permits recovery while the other does not, the policy should be given the construction most favorable to the insured." *Schrock*, 252 P.3d at 102.

*Cady* also involved a different set of facts. In that case, the decedent's cause of death was listed as an overdose of both prescription and non-prescription drugs. In denying Cady's claim for accidental death benefits, Hartford explained that Mr. Marsh should have reasonably foreseen that he could be seriously injured or die from taking

---

[1] To the extent, the *Cady* Court followed *Grobe*, this Court respectfully disagrees for the reasons stated in its discussion of *Grobe*.

non-prescribed drugs, and his assumption of this foreseeable risk was not an accident covered under the policy:

> Please note that the Policy requires that a benefit will be paid if an accidental injury occurs. We do not interpret the word "accident" to include circumstances where it is reasonably foreseeable that death will occur. Accidents by nature are unforeseeable events. **It is a well-known fact that if [sic] consuming four (4) times the therapeutic dose of Xanax and also ingesting Methadone [without a prescription] can cause serious bodily injury or death.** It is our opinion that Mr. Marsh should have reasonably foreseen that such actions would result in severe injury or death, even if death was not intended. The assumption of a known risk by the insured does not constitute an "accident" and the result of that assumption, death in this circumstance, does not constitute a covered injury under the terms of the Policy.

*Id.* at *3 (emphasis added). This Court cannot argue with Hartford's logic in denying Cady's claim for accidental death benefits for Mr. Marsh's death. Taking four times the prescribed dose of a drug in combination with a non-prescribed drug is the sort of assumed-risk behavior that would make a loss foreseeable.

In this case, by contrast, all the evidence suggests that Ms. Ramsey's death was not reasonably foreseeable. She took her medication as prescribed by her physician, and she made every effort to ensure that she was administering the drugs correctly. It is not "a well-known fact" that consuming medications as prescribed by a physician can cause serious injury or death. Indeed, the contrary is true. People take medication as prescribed by their physician expecting to stave off death or injury – not expecting to die. Following a physician's advice in taking medication is not the sort of assumed-risk behavior that makes a loss foreseeable. Thus, it makes sense that Hartford would insure a loss caused

by taking medication as prescribed by a physician but not losses caused by taking illegal or non-prescribed drugs.

Nor should it matter why a physician prescribed the drugs. As just discussed, there is a difference between taking drugs illegally and taking them legally. The former is the type of intentional, risk-taking behavior that an accidental insurance policy would reasonably exclude. Indeed, all eight exclusions identify intentional, risky behavior, such as suicide or participating in war.  But the Court sees no reason to distinguish between accidental overdoses caused by taking, for example, pain medication prescribed to treat shingles, a painful but nonlethal ailment, and accidental overdoses caused by taking pain medication prescribed to treat a broken leg. In both these scenarios the injury results from the same "accident" – the drug overdose – and both overdoses are equally unforeseeable.

An accidental overdose caused by taking drugs as prescribed by a physician is a tragic and unexpected event – no matter the underlying reason for taking the drugs. As the drug exclusion makes clear, the policy here distinguishes between two losses resulting from drug use: drug use as prescribed by a physician and non-prescribed or illegal drug use. To exclude from coverage accidental overdoses caused by taking drugs as prescribed to treat a sickness or disease would defeat the very object or purpose of the insurance, which Idaho law expressly forbids.  *Erikson*, 543 P.2d at 845.

### 4. There Is No Evidence That Hartford Denied Coverage in Bad Faith.

Ramsey requested that the Court allow the case to proceed to trial so the jury can make a determination on his bad faith claim.  The parties did not brief this issue, but it finds no evidence that Hartford acted in bad faith by denying Ramsey's benefits claim.

**MEMORANDUM DECISION AND ORDER** - 16

**5.  Ramsey Is Entitled to a Voluntary Plan Benefit in the Amount of $100,000.**

When Ms. Ramsey filled out her application for accidental death and dismemberment insurance she: (1) accepted the Basic Plan coverage of $1,000 paid by Advantage Plus Federal Credit Union; (2) selected the recommended amount of accidental death and dismemberment coverage in the amount of $100,000; (3) marked the "Family" coverage option which covered the insured, a spouse and any dependent children as defined by the Policy for $1.50 per month for each $10,000.00 in coverage; (4) left the "Single" coverage option blank, which would have covered only the insured (not a spouse or dependent children) at $1.00 per month for each $10,000.00 in coverage; (5) named Johnny Ramsey as her beneficiary and described his relationship to her as her ex-husband; and (6) signed the activation form and dated it May 25, 2006.

Ms. Ramsey marked the "Family" coverage option rather that the "Single" coverage option, which applied to her. This means that she overpaid her premium each month.  Based on the premium payments, Ms. Ramsey would have been entitled to an additional $50,000 in coverage. Ms. Ramsey paid $15.00 per month, which only purchased $100,000.00 of insurance under "Family" coverage. That same $15.00 per month would have purchased $150,000.00 of insurance under "Single" coverage. Therefore, Ramsey argues that he should get $150,000 for the Voluntary plan payment rather than $100,000.

The Court disagrees. Ms. Ramsey clearly marked the $100,000 Voluntary Plan Benefit in her insurance application. From this form, the Court can only infer that Ms. Ramsey intended to enroll and did enroll for $100,000 in additional coverage.  While Ms.

Ramsey did select "Family" coverage when she should have selected individual coverage, Ramsey provides no authority to support his position that the premiums Ms. Ramsey paid for "Family" coverage should somehow convert to premiums paid on Ms. Ramsey's individual coverage. Therefore, Ramsey is not entitled to the additional $50,000 for the additional plan benefit. The Court, however, will direct Hartford to refund the excess premiums.

## ORDER

IT IS ORDERED THAT:

1. Plaintiff's Motion for Partial Summary Judgment (Dkt. 9) is **GRANTED in part and DENIED in part**.

2. Defendant's Motion for Summary Judgment (Dkt. 10) is **GRANTED in part and DENIED in part**.

DATED: April 17, 2013

_____
B. Lynn Winmill
Chief Judge
United States District Court